**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| PRIMELENDING,<br>A PLAINSCAPITAL COMPANY | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO.: _____ |
| | ) | |
| FIRST COMMUNITY MORTGAGE, INC. | ) | |
| | ) | |
| DEFENDANT | ) | |

### COMPLAINT

PrimeLending, a PlainsCapital Company, seeks to recover damages arising from a targeted corporate raid orchestrated by First Community Mortgage, Inc. ("FCM") that caused the coordinated departure of 100 employees on the same date without notice. Rather than investing the time to organically develop its own regional mortgage operation—or negotiating a legitimate acquisition—FCM chose to covertly target PrimeLending's operations. The raid stripped PrimeLending of over $30 million in annual revenue.

FCM approached specific PrimeLending employees, whom the company encouraged to contact others—branch managers, loan officers, operations personnel—extending the campaign to almost an entire regional division. Because PrimeLending employees are subject to non-solicitation clauses, FCM's conduct constituted tortious interference with those employment agreements.

To carry out its plan, FCM used a recruiter named Gary Sindall at CAVU Partners, who had access to PrimeLending's confidential information—acquired while recruiting for PrimeLending for over eleven years. By leveraging CAVU, FCM tortiously interfered with CAVU's contractual obligations to PrimeLending.

Case 3:22-cv-01042   Document 1   Filed 12/20/22   Page 1 of 29 PageID #: 1

## PARTIES & SERVICE

1.  PrimeLending is a mortgage lender organized under the laws of the State of Texas with its principal place of business in Dallas, Texas.

2.  FCM is a Tennessee corporation with its principal place of business located at 262 Robert Rose Drive, Murfreesboro, Tennessee 37129. FCM may be served by serving its registered agent, Universal Registered Agents, Inc., at 992 Davidson Drive, Suite B, Nashville, Tennessee 37205-1051.

3.  Complete diversity exists among the parties.

    a.  PrimeLending is a citizen of Texas, pursuant to 28 U.S.C. § 1332(c)(1) because it is incorporated in Texas and maintains its principal place of business in Texas.

    b.  FCM is a citizen of Tennessee, pursuant to 28 U.S.C. § 1332(c)(1) because it is a Tennessee corporation whose principal place of business is located in Rutherford County, Tennessee.

## JURISDICTION & VENUE

4.  This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1836(b) because PrimeLending asserts a claim arising under the laws of the United States.

5.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists.

6.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because FCM's headquarters are located in this judicial district.

2

7.     This Complaint uses these definitions:

a.     "**Proprietary Information**" includes both the Confidential Information and Trade Secrets of PrimeLending.

b.     "**Trade Secrets**" means information protected under the Tennessee Uniform Trade Secrets Act or the federal Defend Trade Secrets Act.

c.     "**Confidential Information**" means the data and information of PrimeLending that is disclosed or becomes known to its employees in connection with their employment, or that has value to PrimeLending and is not generally known to its competitors.

## FACTUAL ALLEGATIONS

### *FCM's Orchestrated Raid of an Entire Regional Division*

8.     On September 1, 2022, about 100 employees from PrimeLending's Mid-America regional division submitted resignations and left for employment with FCM without notice. The departures included a regional manager, four key branch managers, and the regional operations manager.

9.     FCM is a mortgage lender based in Tennessee with operations and retail offices throughout the United States, including the geographical areas that comprise PrimeLending's Mid-America regional division. It directly competes with PrimeLending in many markets across the United States.

10.     Like the positions held by the departed employees with PrimeLending, their new roles at FCM include mortgage loan origination and related responsibilities.

11.     Shortly before their departure from PrimeLending for FCM, many of the departed employees exported information pertaining to loans of PrimeLending customers, without

3

consent. Some of the employees began exporting this data as far back as January 2022. The exported data includes customer records, loan records, pipeline reports, loan estimates, and contracts from PrimeLending's system—all Trade Secrets of PrimeLending.

12.     Mack Powell, a former branch manager at PrimeLending who reported to former regional manager Bret Head, personally removed confidential loan files from a PrimeLending office location in Shelbyville, Indiana by entering the premises on false pretenses twenty-five days after tendering his resignation without notice.

13.     These actions are a foreseeable result of the mass solicitation and exodus of PrimeLending employees orchestrated by FCM. Given that FCM is a competitor of PrimeLending—and that the roles and responsibilities of the departed employees at FCM are substantially the same as those of their previous positions with PrimeLending—the departed employees likely exported PrimeLending's customer lists and other confidential and Proprietary Information to use at FCM.

14.     On the same day the departed employees announced their resignations, PrimeLending received correspondence from FCM's counsel, notifying its competitor of the corporate raid it had orchestrated. In its correspondence, FCM explained that it hired CAVU and Mr. Sindall to facilitate and assist with "recruiting" PrimeLending employees. This "recruitment process"—a convenient euphemism—took place over approximately a four-month period, as FCM explained in its correspondence. That length of time overlaps with invoices submitted by CAVU and Mr. Sindall to PrimeLending for recruitment services. In other words, CAVU and Mr. Sindall sought to be paid by PrimeLending while they simultaneously eviscerated the company's Mid-America operations.

4

15. PrimeLending's investigation confirmed FCM's representations regarding CAVU and Mr. Sindall's involvement in its coordinated raid. The investigation also revealed that CAVU and Mr. Sindall worked closely with the managers of the departed employees, including Bret Head.

16. CAVU is a recruiting firm which specializes in the mortgage industry. The company describes itself as a "niche executive search firm that focuses exclusively on the mortgage industry and connects top performing people with high performance companies."[1] In 2011, PrimeLending, through its staff, and CAVU, through Mr. Sindall, began to discuss CAVU's search services for PrimeLending, including helping PrimeLending recruit candidates for the Mid-America region.

17. PrimeLending entered into a recruiting agreement with CAVU evidenced by a Professional Recruiting Agreement (the "Recruiting Agreement"). A true and correct copy of the Recruiting Agreement is attached as **Exhibit 1**.

18. Mr. Sindall is a founding partner of CAVU, and he was the primary contact for CAVU with PrimeLending over their 11+ year business relationship.

### *CAVU's Contractual Obligations to PrimeLending*

19. In the Recruiting Agreement, CAVU acknowledged that PrimeLending would make available confidential and Proprietary Information, including Trade Secrets, to CAVU and that CAVU would have no right to that confidential and proprietary material, as it is the exclusive property of PrimeLending. CAVU agreed that it was not to use nor copy the material "[e]xcept as essential to [CAVU]'s obligations under [the Recruiting Agreement]."

---

[1] *See* https://www.gocavu.com/ ("About Us" page).

20.     The Recruiting Agreement included a non-solicitation clause which provides that CAVU shall not, for any reason, hire or attempt to hire any current employee of PrimeLending away from the company. The clause also prohibited CAVU from assisting in hiring or encouraging a current employee of PrimeLending to terminate employment with the company. The non-solicitation clause applied during the contractual term and for one year after the Recruiting Agreement was terminated.

21.     CAVU's non-solicitation and confidentiality obligations survive termination of the Recruiting Agreement. Specifically, CAVU's non-solicitation obligations persist for one year, while its confidentiality obligations persist indefinitely.

### *CAVU's Fiduciary Relationship with PrimeLending*

22.     The Recruiting Agreement and the 11+ year business relationship between PrimeLending and CAVU reflected a broader, ongoing relationship among PrimeLending, CAVU, and Mr. Sindall.

23.     PrimeLending relied upon CAVU and Mr. Sindall for advice and assistance, including help with obtaining the most qualified talent in the industry. PrimeLending also relied upon CAVU's and Mr. Sindall's knowledge of the marketplace for mortgage industry staff and management—including the candidate pool, candidate qualifications and skills, candidate ability to accommodate PrimeLending's institutional needs and organizational structure, candidate market value, and the best means of structuring candidate compensation packages.

24.     Candidates for employment in the mortgage industry generally want in-depth information about the position and they request detailed information about a potential employer's business to fully evaluate an offer of employment. This includes information regarding the prospective employer's loan portfolio, risk appetite, breadth and depth of product and service

offerings, knowledge, talent, and skills of its current employees, and strategic initiatives with respect to business development. Recruiting agencies generally function as a middleman between candidates and prospective employers. They are necessarily exposed to highly confidential and sensitive business information of their clients.

25.     To ensure that CAVU and Mr. Sindall could effectively render recruiting services, PrimeLending made CAVU and Mr. Sindall aware of highly confidential and sensitive information regarding PrimeLending and its business. This includes information about PrimeLending's financial performance, strategic planning, existing and potential products and services, significant client relationships, sales strategies, and compensation policies and practices, including base salaries, bonuses, and incentive programs, and confidential human resources information, including educational background, work history, skills, and total compensation amounts for individual employees. PrimeLending has invested considerable time, effort, and money in developing this information and has taken precautionary measures to ensure the confidentiality of such information.

26.     To further ensure that CAVU and Mr. Sindall could effectively perform, PrimeLending gave CAVU and Mr. Sindall access to PrimeLending employees so CAVU and its personnel could appropriately assess PrimeLending's organizational and institutional needs. Solely because of the relationship established by PrimeLending, CAVU and Mr. Sindall were able to create, cultivate, and foster relationships with PrimeLending employees.

***CAVU's Continued Working Relationship with PrimeLending***

27.     After nearly 10 years of working with PrimeLending, CAVU's Recruiting Agreement was not extended after its latest term expired and the agreement ended on June 12, 2020. CAVU and Mr. Sindall continued discussions with PrimeLending about extending the

contractual relationship, and the working relationship continued. Mr. Sindall and Mr. Head maintained a close working relationship dating back to 2016 when Mr. Head was first recruited by CAVU and Mr. Sindall to join PrimeLending.

28.     After the Recruiting Agreement was terminated, CAVU continued to provide the same recruiting services to PrimeLending that it had provided under the Recruiting Agreement. The same terms of payment and other provisions under the Recruiting Agreement were applied to all services provided by CAVU and Mr. Sindall as recently as September 2022. In effect, the parties continued to operate under the terms of the Recruiting Agreement despite not formally renewing it.

29.     This continued working relationship was evidenced by the ongoing communications between Mr. Sindall and PrimeLending. For example, on May 14, 2021, Mr. Sindall sent to Mr. Head the resume of a loan officer with 30 years' experience, representing that "[h]er specialty is conventional, self-employed borrowers, jumbo, condo, high risk collateral." Mr. Head forwarded the resume to PrimeLending's underwriting team, adding "If interest[ed], I will fill you in on my decade plus relationship with Gary."

30.     CAVU and Mr. Sindall sought to maintain their relationship with PrimeLending—and especially given the revenue they extracted from PrimeLending—up until just weeks before FCM executed its plan. On July 21, 2022, Mr. Sindall wrote to Mark Steele, a PrimeLending branch manager, to inquire about the production volume of a loan officer who CAVU had placed because its compensation for placements is based, in part, on post-placement production volume. In other words, Mr. Sindall wanted to make sure he got paid before news of the corporate raid and their surreptitious and ethically dubious efforts to assist its competitor became public.

31.     Mr. Steele promptly provided the requested information to Mr. Sindall, who wasted no time in responding with an invoice. PrimeLending paid the invoice to CAVU and Mr. Sindall.

32.     Further evidencing the ongoing recruiting relationship between CAVU and PrimeLending, Mr. Steele asked Mr. Sindall on July 21, 2022, "Do you have any more [loan officers] like her?"

33.     During the 11+ years that CAVU and Mr. Sindall actively recruited for PrimeLending, they obtained a substantial amount of PrimeLending's confidential and Proprietary Information, including loan origination volume data, hiring, staffing, and succession planning information, and compensation information, including that of key employees.

### Mr. Head's Employment at PrimeLending

34.     Bret Head joined PrimeLending in 2016. CAVU and Mr. Sindall originally recruited Mr. Head for PrimeLending, as well as other former PrimeLending employees that he would later poach for FCM.

35.     During his tenure at PrimeLending, Mr. Head held several key positions and leadership and management roles, having served most recently as regional manager of PrimeLending's Mid-America regional division.

36.     As a regional manager, Mr. Head was intimately involved in PrimeLending's fundamental business, policy decision-making, and strategic planning—providing him with access to highly sensitive, confidential and Proprietary Information. This included extensive Confidential Information regarding his direct and indirect subordinates, including their client relationships, historical performance metrics and evaluations, and compensation information— the type of information that provides access to potential job applicants and guidance with respect

9

to current market compensation rates, which companies often pay substantial sums of money to obtain from consulting firms for use in determining and updating their compensation plans and other related human resources policies.

37. PrimeLending has vigilantly protected its confidential and Proprietary Information, including the above-described information. The steps taken by PrimeLending to protect its confidential and Proprietary Information include the development and implementation of policies and procedures designed to protect the information from disclosure, the inclusion of confidentiality provisions in its employment agreements, and its onboarding policies which requires new employees to enter into such employment agreement as a condition of employment. As a result, PrimeLending employees with access to its confidential and Proprietary Information are subject to contractual confidentiality obligations designed to protect PrimeLending's information from wrongful use and disclosure.

*PrimeLending's Employment Agreement Obligations[2]*

*—Exclusivity*

38. PrimeLending's employment agreement includes non-solicitation, non-disclosure, and exclusivity obligations that survive termination of employment with PrimeLending.

39. The exclusivity obligations preclude employees from "at any time hav[ing] any employment in or render[ing] any services to any other person or organization, whether for compensation or otherwise, related to mortgage lending, consumer finance, real estate, or any related field."

---

[2] This Complaint cites language from the Regional Manager Agreement of Bret Head and the Branch Manager Agreement of Mack Howell as examples of the specific language used to represent, generally, the obligations of employees at PrimeLending.

40.    The Employment Agreement also prohibits employees from conducting or permitting business activities from PrimeLending's offices other than those conducted for PrimeLending.

### —*Non-Solicitation*

41.    The Employment Agreement prohibits employees from soliciting PrimeLending employees while in its employ and for a one-year period thereafter.

### —*Non-Interference*

42.    The Employment Agreement also prohibits employees from interfering with PrimeLending's business relationships—an obligation that survives termination of employment with PrimeLending.

### —*Confidentiality*

43.    The Employment Agreement includes confidentiality obligations and restrictive covenants with respect to PrimeLending's proprietary information.

44.    PrimeLending's Employment Agreement also required employees to:

   a.    "protect and maintain the confidentiality of the Proprietary Information during Employee's employment with [PrimeLending];"

   b.    "not … take or remove Proprietary Information from [PrimeLending]'s premises or electronic data systems without [PrimeLending]'s prior express permission";

   c.    "not use [PrimeLending]'s Trade Secrets, Confidential Information or Proprietary Information for personal use or the benefit of a third party;"

   d.    "return immediately any and all materials constituting, containing or reflecting Proprietary Information in Employee's possession or under

Employee's control … upon termination of Employee's employment for any reason" which specifically includes, among other things, "all … Loan Documents, Confidential Information, … [and] printouts;"

e. "not to take away or retain any originals or copies of Proprietary Information in any form (including, but not limited to, electronically stored Proprietary Information) following the termination of [his] employment with [PrimeLending] for any reason;" and

f. "not, either during [their] employment with [PrimeLending] or at any time after such employment ends for any reason, directly or indirectly use or disclose to others any Proprietary Information except in connection with the performance of [their] authorized duties" for so long as such Proprietary Information constitutes Confidential Information or a trade secret under applicable law."

45.   The Employment Agreement's non-solicitation provisions are effective during employment and for a one-year period after employment. They prohibit solicitation of any PrimeLending employees with whom the employee has "material contact." The departed employees promised they would not:

a. "directly or indirectly, solicit, recruit, or hire, or knowingly assist any third party in the solicitation, recruitment, or hiring, of any [PrimeLending employee] at any time within the year prior to the date [they] ceased employment with [PrimeLending];" or

b. "induce or attempt to induce any [such] employee to leave [PrimeLending's] employment."

46.     Under the terms of the Regional Manager Agreement, "material contact" includes employees whose dealings with [PrimeLending] "were coordinated or supervised by [such employee], or about whom [they] obtained Proprietary Information in the ordinary course of business as a result of [their] employment with [PrimeLending]."

47.     FCM knew or should have known of the obligations owed to PrimeLending by the employees it poached. Under the terms of their employment agreements with PrimeLending, departing employees are required to inform their new employer of PrimeLending's employment agreement as well as provide their new employer with a copy of PrimeLending's employment agreement.

48.     FCM admitted its knowledge of these obligations in a letter sent by its counsel on September 1, 2022. In that letter, FCM notified PrimeLending for the first time that it intended to poach "up to 100 or more employees" of PrimeLending. FCM also claimed that it has not accepted or requested the assistance of any current PrimeLending employee or any "former PrimeLending employee subject to a non-solicit agreement."

49.     CAVU and Mr. Sindall, who worked on FCM's behalf and at its behest, were also aware of these employment agreement obligations, given their long-standing relationship with PrimeLending and the nature of their business, which granted them access to PrimeLending's employment agreements to convey to candidates the expectations of their potential new employer.

**FCM's Post-Raid Actions**

50.     Having completed its corporate raid, FCM continues to seek profit, at PrimeLending's expense, or to simply injure PrimeLending in the marketplace. FCM's post-raid

actions include hijacking PrimeLending's regional social media profile and abandoning FCM property in PrimeLending offices, causing additional holdover rent damages.

*—Hijacked Google Page*

51.     After the raid, FCM took control of PrimeLending's regional "Google My Business" profile. Google My Business is a feature that provides a highlighted section of information pertaining to a specific business. Before the raid, a search for "PrimeLending Indianapolis" would produce links to the company's regional office and a special Google My Business profile would appear to the right of the search results.

52.     After the raid, the same search produced links to PrimeLending's office, but the highlighted profile contained the logo and information for FCM:



53.     The hijacked Google My Business profile has likely caused customer confusion and has likely misdirected business from PrimeLending to FCM.

54.     After weeks of demanding that FCM release control of the page to PrimeLending, FCM apparently deleted or removed the page.

*—Abandoned Property*

55.     After the raid, FCM purchased some of PrimeLending's office furniture and assumed some (but not all) of PrimeLending's commercial leases in the region.

56.     PrimeLending suffered additional damages and legal fees arising from FCM's abandoned property and other lease violations.

***Damages Caused by the Mass Exit of an Entire Regional Division without Notice***

57.     Losses caused by the unexpected exodus of almost 100 employees from PrimeLending has affected and will continue to affect the PrimeLending's business negatively.

58.     **First**, PrimeLending has suffered a loss of production and gross revenue. The next projected 12 months for PrimeLending show that lost gross revenue exceeds $30 million.

59.     **Second**, PrimeLending has incurred and will incur damages related to its facilities. Numerous office leases have been vacated due to the vacating of office space. In some instances, PrimeLending cannot terminate these leases and must continue rent payments. Otherwise, PrimeLending may suffer early termination fees for breaking leases early, and it may possibly pay pro-rated rental payments for office space which shall be maintained but will be partially occupied by a diminished staff. Despite its best efforts to mitigate its damages, and abundant notice to FCM, PrimeLending has incurred these damages:

      a.   Eau Claire Office: $17,883.06

      b.   Troy Office: $44,612.12

      c.   Cincinnati Office: $70,101.00

      d.   Indianapolis Office: $20,667.22 and counting.

60. **Third**, PrimeLending may incur early payoff penalties for departed employees who target borrowers to refinance their loans originated with PrimeLending. The refinance will prompt early payoff penalties to investors in the loans.

61. **Fourth**, PrimeLending will suffer significant business disruption, due to the loss of of an entire regional division that represents about 10% of its total lending workforce. This significantly impairs PrimeLending's ability to serve the geographical area due to its loss of workforce and community contacts, and also impairs PrimeLending's ability to recruit lending staff for its Mid-America regional division.

62. **Fifth**, PrimeLending will suffer damage due to the use by FCM, CAVU, Gary Sindall, Bret Head, and the other departed employees of its confidential or trade secret information, including customer lists. Future business from these customers will be unfairly intercepted, and FCM and the departed employees will reap the benefits of the future business opportunities that were effectively stolen from PrimeLending. Mr. Howell's theft of confidential loan documents from the Shelbyville office twenty-five days after he voluntarily left PrimeLending is an example of the foreseeable damages which PrimeLending has suffered and will likely continue to suffer, without the court's intervention.

63. **Sixth**, PrimeLending has suffered damages in the payment of commissions paid to CAVU and Mr. Sindall while they breached their contractual and fiduciary obligations to PrimeLending and aided and abetted PrimeLending employees in the breach of their contractual and fiduciary obligations.

***Count 1: FCM Misappropriated PrimeLending's Trade Secrets under Federal and State Law***

64.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., applies to this claim because it involves interstate commerce—specifically, a regional mortgage operation that spanned multiple states.

65.     The DTSA forbids threatened and actual misappropriation of Trade Secrets "if the trade secret is related to product or service used in, or intended for use in, interstate or foreign commerce."

66.     "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic, or engineering information."

67.     The Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701, et seq., applies because FCM is a Tennnese entity and is headquartered in Tennessee.

68.     The TUTSA forbids the misappropriation of Trade Secrets whether by acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means or by disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire the trade secret.

69.     TUTSA broadly defines "Trade Secrets" as information that is "technical, nontechnical, or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan" that: (1) derives independent economic value from not being generally known; (2) would provide economic value to others from its disclosure; and (3) is subject to "reasonable" efforts to maintain its secrecy. Tenn. Code Ann. §47 25 1702(4).

70.     As described above, certain confidential, Proprietary Information of PrimeLending constitutes Trade Secrets under the DTSA and the TUTSA, including but not

limited to loan origination volume data; hiring, staffing, and succession planning information; compensation information; and customer loan information which specifically include non-technical data, formulas, compilations, and customer lists in its definition of a trade secret.

71.     PrimeLending's loan origination volume data; hiring, staffing, and succession planning information; compensation information; and customer information are Trade Secrets under the DTSA because:

       a.    it consists of secret information that is not generally known to and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

       b.    PrimeLending derives independent economic value, actual or potential, from the information contained therein; and

       c.    it relates to interstate commerce because both actual and potential customers of PrimeLending residing in multiple states are included therein.

72.     PrimeLending derives independent economic value from such information not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information.

73.     PrimeLending took steps to maintain the confidentiality of its loan origination volume data; hiring, staffing, and succession planning information; compensation information; and customer information by controlling its dissemination by, among other things, requiring its employees and independent contractors to execute confidentiality agreements. For example, the Recruiting Agreement executed by CAVU specifically includes:

> a. an acknowledgment that certain information, including but not limited to, customer lists and printouts, is PrimeLending's Proprietary Information; and
>
> b. a restriction on disclosing, disseminating, or using PrimeLending's Proprietary Information for the benefit of anyone other than PrimeLending.

74. PrimeLending's loan origintion volume data; hiring, staffing, and succession planning information; compensation information; and customer information were not readily ascertainable by the public because they were obtained from departing employees that were obligated to inform FCM of their post-employment confidentiality obligations to PrimeLending and from CAVU and Mr. Sindall who obtained this information on behalf of FCM and for its benefit solely through their Recruiting Agreement with PrimeLending. PrimeLending was deprived of the independent economic value of its confidential and Proprietary Information because it was used by FCM to locate and induce employees away from PrimeLending and has likely been used by FCM or will be used by FCM to poach existing and potential customers.

75. FCM's acquisition and use of PrimeLending's Trade Secrets constitutes misappropriation of Trade Secrets, which was wrongfully used and was subject to confidentiality restrictions and obligations, constitutes misappropriation of Trade Secrets under both the DTSA and TUTSA because FCM knew or had reason to know that CAVU, Mr. Sindall, Bret Head, Mack Howell, and other departed employees had a duty to not wrongfully disclose or use PrimeLending's Trade Secrets.

76. Specifically, at FCM's direction, CAVU, Mr. Sindall, Mr. Head, Mr. Howell, and other departed employees misappropriated PrimeLending's Trade Secrets because, without PrimeLending's consent, the information was:

    a.    obtained by improper means when it was wrongfully taken by Mr. Sindall, Mr. Head, and other departed employees from PrimeLending in anticipation of the mass exit of about 100 employees from PrimeLending that they surreptitiously coordinated;

    b.    provided by Mr. Sindall, Mr. Head, and other departed employees of PrimeLending to its competitor, FCM; and

    c.    used by Mr. Sindall, Mr. Head, and other departed employees to solicit other PrimeLending employees on FCM's behalf.

77. FCM was also aware of the misappropriation by Mr. Head and other departed employees of PrimeLending because FCM worked those employees over a four-month period to recruit them.

78. FCM knew or had reason to know that PrimeLending's confidential and Proprietary Information was obtained by improper means because it was provided to a competitor by CAVU, Mr. Sindall, Mr. Head, and the other departed employees without PrimeLending's consent.

79. Due to the misappropriation of PrimeLending's confidential and propriety information, PrimeLending has suffered and will suffer lost business and revenue; damages due to vacated or substantially vacated office leases; early payoff penalties; and business disruption. FCM has used and/or intends to use such information for its benefit in a manner that has and will

cause damages to PrimeLending, including the increased overhead expense and lost revenue associated with the overnight loss of an entire regional business division that it orchestrated.

*Count 2:*      *FCM Tortiously Interfered with Contractual Obligations*

*Count 2a:*      *CAVU's Contractual Obligations to PrimeLending (Confidentiality)*

80.     PrimeLending and CAVU entered into a valid and enforceable agreement (i.e., the Recrruiting Agreement), pursuant to which CAVU was prohibited from using or disseminating PrimeLending's confidential and Proprietary Information.

81.     The Recruiting Agreement is governed by Texas law because it includes a choice-of-law provision that selects Texas law.

82.     PrimeLending has duly performed all conditions, covenants, and obligations required on its part to be performed under the Recruiting Agreement.

83.     Under Texas law, CAVU's actions constitute breach of its obligations to PrimeLending under the Recruiting Agreement, including their non-disclosure obligations.

84.     With FCM's encouragement and substantial assistance, CAVU has repeatedly breached its obligations under the Recruiting Agreement by using and disseminating confidential and Proprietary Information belonging to PrimeLending to induce and solicit employees to leave PrimeLending for FCM.

85.     FCM knew or had reason to know that knew that CAVU and Mr. Sindall were contractually bound to preserve the confidentiality of PrimeLending's confidential and Proprietary Information. This is because FCM knew or had reason to know that CAVU also recruited for PrimeLending and presumably that CAVU entered into an agreement with FCM that was substantially similar to the Recruiting Agreement, since, like most third-party vendors, it is CAVU's business practice to supply their version of a recruiting agreement to their clients.

Moreover, recruiting relationships are generally subject to confidentiality obligations given the sensitivity of the information being exchanged to facilitate that relationship, including individual employee compensation information and the confidential and Proprietary Information of the client company.

86. Despite having this knowledge, FCM knowingly induced and encouraged CAVU and Mr. Sindall to breach their contractual confidentiality obligations to PrimeLending.

87. FCM's inducement and encouragement of this breach resulted in losses from the impact on PrimeLending's business operations caused by the unexpected departure of an entire regional division and losses associated with the substantial investment made by PrimeLending in each departed employee over the course of their employment relationship with PrimeLending, including losses associated with the vacating of leased space, early payoff penalties, business disruption, commissions paid to CAVU and Mr. Sindall without knowledge of their misappropriation, and other potential damages related to the use by FCM of PrimeLending's confidential and Proprietary Information.

88. FCM intended to induce CAVU to breach its contractual obligations of confidentiality to PrimeLending because doing so was necessary in order to effect the coordinated mass exit that FCM orchestrated. This is because CAVU's access to PrimeLending's confidential and Proprietary Information and its access to PrimeLending employees was necessary for FCM to pull off a corporate raid on such a grand scale.

89. FCM's inducement of CAVU's breach of its contractual obligations was done maliciously because rather than recruiting individual candidates through legitimate means from the general public, over time—which would have given PrimeLending the opportunity to retain some, if not most, of its regional staff that it worked hard and invested substantially in to grow

and develop over time—FCM set its eyes on effectively stealing an established, well-run regional mortgage operation. To accomplish its objective, FCM worked behind the scenes, in secret, to orchestrate by coordinating the mass exit of an entire regional division on a specific date without advance notice. This manner in which this was done was designed by FCM to prevent PrimeLending from having any meaningful opportunity to retain its departing employees, further ensuring its success in its devious plot.

### Count 2b: CAVU's Implied Contractual Obligations (Non-Solicitation & Confidentiality)

90. PrimeLending and CAVU had a valid and enforceable implied contract despite expiration of the Recruiting Agreement.

91. Texas law applies to this claim because the Recruiting Agreement selects Texas law. In the alternative, Georgia law applies to this claim because CAVU is a Georgia entity and headquartered in Georgia. In either case, both Texas and Georgia courts recognize implied contracts under these circumstances.

92. As a result of the continued conduct of CAVU and Mr. Sindall to provide recruiting services and to rely upon confidential and proprietary from PrimeLending, CAVU and Mr. Sindall covenanted that they were still prohibited from directly or indirectly soliciting, inducing, recruiting, or enticing employees within PrimeLending's business. The prohibitions against the use and dissemination of confidential and Proprietary Information belonging to PrimeLending by CAVU also applied to the implied contract between PrimeLending, CAVU, and Mr. Sindall.

93. PrimeLending has duly performed all conditions, covenants, and obligations required on its part to be performed under the implied contract, including payment of all invoices received from CAVU for services rendered under the implied contract.

94.     With FCM's encouragement and substantial assistance, CAVU and Mr. Sindall repeatedly breached their obligations under the implied contract by:

    a.  directly or indirectly soliciting, inducing, recruiting, or enticing PrimeLending's employees; and

    b.  using and disseminating PrimeLending's confidential and Proprietary Information to induce and solicit PrimeLending employees for its benefit.

95.     FCM knew or had reason to know that knew that CAVU and Mr. Sindall implied contractual obligations to to preserve the confidentiality of PrimeLending's confidential and Proprietary Information and to refrain from soliciting PrimeLending employees. This is because FCM knew or had reason to know that CAVU also recruited for PrimeLending and that CAVU would be necessary bound by implied contractual obligations to facilitate a recruiting relationship that would be reasonably expected to include confidentiality and non-solicitation obligations. This is because recruiting relationships are generally subject to confidentiality obligations given the sensitivity of the information being exchanged to facilitate that relationship, including individual employee compensation information and the confidential and Proprietary Information of the client company. Recruiting relationships are also typically governed by contractual obligations that include non-solicitation obligations in order to disincentivize churn.

96.     Despite having this knowledge, FCM knowingly induced and encouraged CAVU and Mr. Sindall to breach their implied contractual obligations to PrimeLending.

97.     FCM's inducement and encouragement of this breach resulted in losses from the impact on PrimeLending's business operations caused by the unexpected departure of an entire regional division and losses associated with the substantial investment made by PrimeLending in

each departed employee over the course of their employment relationship with PrimeLending, including losses associated with the vacating of leased space, early payoff penalties, business disruption, commissions paid to CAVU and Mr. Sindall without PrimeLending's knowledge of their treachery, and other potential damages related to the use by FCM of PrimeLending's confidential and Proprietary Information.

98. FCM intended to induce CAVU to breach its implied contractual obligations of confidentiality and non-solicitation to PrimeLending because doing so was necessary in order to effect the coordinated mass exit that FCM orchestrated. This is because CAVU's access to PrimeLending's confidential and Proprietary Information and its access to PrimeLending employees was necessary to pull off a coordinated corporate raid on such a grand scale.

99. FCM's inducement of CAVU's breach of its implied contractual obligations was done maliciously because rather than recruiting individual candidates through legitimate means from the general public, over time—which would have given PrimeLending the opportunity to retain some, if not most, of its regional operations that it worked hard and invested substantially in to grow and develop—FCM set its eyes on effectively stealing an established, well-run regional mortgage operation. To accomplish its objective, FCM worked behind the scenes, in secret, to orchestrate by coordinating the mass exit of an entire regional division on a specific date without advance notice. This manner in which this was done was designed by FCM to prevent PrimeLending from having any meaningful opportunity to retain its departing employees, further ensuring its success in its devious plot.

> **Count 2c:** **Former Employee Contractual Obligations Under Their Employment Agreement**

100. The employment agreements of the departed employees constitute valid and legally enforceable contracts between PrimeLending and the departed employees.

101. The employment agreements are governed by Texas law because they include a choice-of-law provision selecting Texas law.

102. PrimeLending performed its obligations under the employment agreements by, among other things, providing the departed employees, including Mr. Head, with access to its confidential and Proprietary Information.

103. Under Texas law, the departed employees' actions constitute breaches of their obligations to PrimeLending under the employment agreements, including their non-solicitation, non-disclosure, and fiduciary obligations.

104. FCM's actions constitute tortious interference with contract under Tennessee law which applies because FCM is a Tennessee entity and headquartered in Tennessee.

105. Because departed employees are obligated under the employment agreements to notify their new employers of the existence of their employment agreement and provide them with a copy of the employment agreement, FCM knew or should have known that the departed employees were subject to employment agreements as well as their obligations to PrimeLending, including their non-solicitation, non-disclosure, and fiduciary obligations.

106. The scheme was furthered by using PrimeLending's Confidential Information to solicit additional employees to leave PrimeLending and take that Confidential Information, including customer loan information, to FCM.

107. FCM not only induced the departed employees to breach their obligations with respect to the solicitation of additional PrimeLending employees but also participated in the scheme by actively soliciting PrimeLending employees, either directly or indirectly through CAVU and Mr. Sindall, to leave the company for FCM. Without assurances from FCM that

employment would be offered to defecting PrimeLending employees, Mr. Head and other departed employees would not have been able to poach PrimeLending employees.

108.    FCM intended to induce departing employees to breach their contract because doing so was necessary in order to effect the coordinated mass exit that FCM orchestrated because without enlisting departing employees to recruit and solicit other PrimeLending employees in breach of their employment agreement, FCM would have been unable to pull of the orchestrated mass exit.

109.    FCM's inducement of the departed employees was done maliciously because rather than recruiting individual candidates through legitimate means from the general public, over time—which would have given PrimeLending the opportunity to retain some, if not most, of its regional operations that it worked hard and invested substantially in to grow and develop— FCM set its eyes on effectively stealing an established, well-run regional mortgage operation which it worked behind the scenes, in secret, to orchestrate by coordinating the mass exit of an entire regional division on a specific date without advance notice. Presumably, this measure was taken to prevent PrimeLending from having any meaningful opportunity to retain its departing employees, further ensuring FCM's success in its devious plot.

> **Count 3:     FCM Aided and Abetted Bret Head in the Breach of the Common Law Fiduciary Duties He Owed to PrimeLending as its Employee**

110.    With FCM's encouragement and substantial assistance, Bret Head breached his fiduciary duties to PrimeLending by soliciting other PrimeLending employees while still in its employ.

111.    FCM knew or had reason to know that knew that Mr. Head owed fiduciary duties under common law to PrimeLending, including but not limited to the fiduciary duty of loyalty

owed by employees to their employer that arises under Indiana common law, which applies in this case because Mr. Head is a resident of Indiana and worked for PrimeLending in Indiana.

112. Despite having this knowledge, FCM knowingly induced and encouraged Mr. Head's breach of the duty of loyalty he owed to PrimeLending by actively participating in his solicitation of PrimeLending employees, either directly or indirectly through CAVU and Mr. Sindall.

113. FCM's inducement and encouragement of Mr. Head's breach of the duty of loyalty he owed to PrimeLending directly resulted in losses resulting from the impact on PrimeLending's business operations caused by the unexpected departure of an entire regional division and losses associated with the substantial investment made by PrimeLending in each departed employee over the course of their employment relationship with PrimeLending. FCM's involvement in Mr. Head's breach of the duty of loyalty he owed to PrimeLending also resulted in the damages caused by the vacating of leased space, early payoff penalties, business disruption, commissions paid to CAVU and Mr. Sindall without PrimeLending's knowledge of their misappropriation, and other potential damages related to the use by FCM of PrimeLending's confidential and Proprietary Information.

### DAMAGES

114. PrimeLending has suffered damages of at least $30,000,000.00 resulting from FCM's misappropriation of PrimeLending's Trade Secrets under federal and state law; FCM's tortious interference with the departed employees' contractual obligations under their employment agreements; FCM's tortious interference with the contractual obligations owed by CAVU and Mr. Sindall to PrimeLending, and FCM's aiding and abetting of Mr. Head's breach of the fiduciary duties he owed to PrimeLending under Indinana common law.

**PRAYER**

PrimeLending asks for judgment against FCM for:

a.  PrimeLending's actual damages; pre- and post-judgment interest, attorneys' fees and expenses;

b.  treble damages for FCM's tortious interference pursuant to Tenn. Code Ann. §47-50-109; and

c.  disgorgement of profits from FCM for revenues and profits obtained through the wrongful solicitation of PrimeLending employees.

PrimeLending seeks to enjoin FCM from further misappropriation of its Trade Secrets and to immediately return all proprietary information wrongfully taken from PrimeLending.

PrimeLending also asks for all other relief to which it is entitled.

Respectfully submitted this 20th day of December, 2022.

_/s/ Stephen H. Price_

Stephen H. Price, _Tennessee Bar No. 014658_
**JACKSON LEWIS P.C.**
CitySpace
611 Commerce Street, Suite 3102
Nashville, Tennessee 37203
(615) 565-1662
stephen.price@jacksonlewis.com

David M. Clem, _Pro Hac Vice Pending_
Nathan A. McDonald, _Pro Hac Vice Pending_
**JOHNSTON CLEM GIFFORD PLLC**
1717 Main Street, Suite 3000
Dallas, Texas 75201
(214) 974-8000 Main
dclem@johnstonclem.com
nmcdonald@johnstonclem.com

***ATTORNEYS FOR PLAINTIFF***

29